E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ANDREW BROWN (Cal. Bar No. 172009)
Assistant United States Attorney
Major Frauds Section
 1100 United States Courthouse
 312 North Spring Street
 Los Angeles, California 90012
 Telephone: (213) 894-0102
 Facsimile: (213) 894-6269
 E-mail:   andrew.brown@usdoj.gov
Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>    v.<br><br>GHEORGHE DUMITRU,<br> aka Ionut Romeo, and<br>MARIA DUMITRU,<br> aka Monica Dumitru,<br><br>   Defendants. | No. 2:21-CR-00541-MWF-1<br><br>GOVERNMENT'S SENTENCING POSITION<br>FOR DEFENDANT GHEORGHE DUMITRU;<br>DECLARATION OF SA PERSAUD;<br>EXHIBIT<br><br>Hearing:  December 5, 2022<br>      2:30pm |

**OBJECTIONS TO THE PRESENTENCE REPORT**

  The government has two objections to the PSR.  First, the documented actual losses in this case are a small fraction of the true losses, requiring the Court to estimate them.  Second, defendant lied to the Probation Officer.  Accordingly, he has not accepted responsibility, but instead has attempted to obstruct justice.

I.   **ESTIMATING LOSS IS REQUIRED WHEN ACTUAL LOSS IS LARGELY UNAVAILABLE, AS HERE**

"In sentencing a defendant for fraud the district court must make a reasonable estimate of the victim's loss." United States v. Gossi, 608 F.3d 574, 581 (9th Cir. 2010) (citations and quotations omitted). "The court need only make a reasonable estimate of the loss." USSG § 2B1.1, app. note 3(C). Estimates need not be elaborate or precise. E.g., United States v. Kelly, 993 F.2d 702, 704 (9th Cir. 1993) (affirming district court's estimate of loss in counterfeit steroid case by doubling defendant's illicit revenue as it "represented only a fraction of the business Kelly had done and intended to do"); United States v. Treadwell, 593 F.3d 990 (9th Cir. 2010) (affirming as a reasonable estimate the district court's decision to attribute 100% of the Ponzi scheme's $44 million in losses to one defendant and 50% to another who joined later and was less involved). Because the "sentencing judge is in a unique position to assess the evidence and estimate the loss" the "court's loss determination is entitled to appropriate deference." USSG § 2B1.1, app. note 3(C).

A.   **EXTRAPOLATING OBSERVED LOSSES OVER THE COURSE OF THE CONSPIRACY**

A common method of estimating loss is through extrapolation, which is listed as one of the techniques for doing so in the sentencing guidelines. E.g., USSG § 2B1.1, app. note 3(C) and 3(C)(iv), (vi) ("The estimate of loss shall be based on available information . . . such as" . . . . "[t]he approximate number of victims multiplied by the average loss to each victim" and "the scope and duration of the offense."). Accordingly, the Ninth Circuit has repeatedly endorsed estimating total loss by

extrapolating loss from a small period of time or a small number of victims to a larger one.  See, United States v. Scrivener, 189 F.3d 944, 949-950 (9th Cir. 1999) (affirming an estimate that extrapolated total loss from a small sample of victims); United States v. Caldwell, 626 Fed.Appx. 683, 688 (9th Cir. 2015) (affirming district court's loss estimate which "extrapolated estimated loss amounts for the prior five years").

The government believes it is important to be cautious in extrapolating loss.  While the guidelines only require a "reasonable estimate" of loss, USSG § 2B1.1, app. note 3(C), established by "a preponderance of the evidence," USSG § 6A1.3 commentary, the government suggests that the Court err on the side of leniency when extrapolating.  That is, the government suggests using a conservative loss per period or per victim, and a conservative number of periods or victims.  Finally, if the Court believes the resulting estimated loss risks being too high, it should reduce the estimate until the Court is confident that it is *less* than the true loss.  Cf. United States v. Wilson, 900 F.2d 1350, 1355-56 (9th Cir. 1990) (affirming district court's estimate of intended loss in attempted sale of trade secrets case which arbitrarily reduced the victim company's "ball park estimate" of value by 75%).  But it would be an abdication of the Court's responsibility to make a reasonable estimate of the loss to reject extrapolation entirely when it is clear, as here, that the criminal conduct extended over years for which loss data is not available.

Gheorghe and Maria Dumitru are professional, international criminals.  While they have been involved in many offenses, discussed later, they have made most of their money through ATM

skimming, which is exceptionally lucrative and hard to detect.  They commonly move from city to city, and even country to country, skimming ATM cards so that by the time local banks and police have realized what is going on in one area, they are in a different jurisdiction and safe from arrest.

We have very limited loss data for Gheorghe and Maria.  San Diego PD surveilled them for a few hours a day on five days in August 2021, and worked with a single bank, Bank of America, to learn how much they had fraudulently withdrawn from that bank. Also, San Diego PD arrested them on September 13, 2021, and so recovered the counterfeit debit cards on their persons on that single day. Using the cards that the Dumitru's were observed to possess, Bank of America was able to associate them with some other cards which had been compromised using the same skimming device. This resulted in a total of 171 cards that were successfully used to withdraw $207,750 in cash.  (Persaud Decl. ¶ 3-4.)

Needless to say, this wildly understates the true losses of the conspiracy for several reasons:

1.   It includes losses only at a single bank;

2.   It excludes intended losses;

3.   It is based on cards used or possessed on only six days during a three-year conspiracy;

4.   It does not include the cards in the possession of their co-conspirators (who were not arrested).

The Intended Loss Per Card Is Over $1,200:

Many of the access devices the defendants counterfeited got them nothing; the genuine holders of the cards extracted all the funds placed on those cards shortly after it was deposited onto

them, leaving nothing for the defendants to later steal.  Needless to say, however, the defendants *intended* to take money from all the cards they went to the trouble of stealing, duplicating, and accessing.  A conservative intended loss figure for an individual access device is the average amount the defendants successfully stole from cards with non-zero balances.  The documented amount stolen from Bank of America divided by the number of cards used to obtain those funds is $1,214 ($207,750 divided by 171 cards).  To be conservative, and to make calculations easier, the government suggests truncating this down to $1,200 per card.

<u>The Minimum Cash Stolen Per Day Is Well Over $5,000</u>

Our best data for how much money this conspiracy generated per day comes from the five days the San Diego PD surveilled Gheorghe and Maria, discussed below:

On August 10, 2021, they observed Gheorghe, Maria, and their juvenile daughter go to seven ATMs from 8:24am to 11:00am (i.e., 2.5 hours) and withdraw **$15,560** in cash using 22 cards.

On August 11, 2021, they observed Gheorghe, Maria, and their juvenile daughter go to three ATMs from 5:49am to 7:57am (i.e., 2 hours) and withdraw **$4,720** in cash using 7 cards.

On August 12, 2021, they observed just Gheorghe and Maria go to five ATMs from 9:22am to 1:02pm (i.e. less than 4 hours) and withdraw **$900** using 1 card.

On August 18, 2021, they observed just Gheorghe and Maria go to six ATMs from 9:10am to 12:06pm (i.e. less than three hours) and withdraw $2,280 using 3 cards.  Bank of America linked these observed withdrawals to three more that were captured only on video surveillance around midnight from three more withdrawals, for a total minimum loss that day of **$5,080** using six cards.

On August 23, 2021, they observed just Gheorghe and Maria go to two ATMs from 10:51am to 12:34pm (i.e. less than two hours) and make two withdrawals totaling **$1,800** using 2 cards.

The total minimum actual withdrawals over the five days is $28,150, or **$5,630** per day.  This necessarily understates the true loss, however, for the following reasons:

1.   Surveillance covered only a few hours of the day, and so missed conduct outside that window; and

2.   The surveillance was directed only at Gheorghe and Maria, and so missed the conduct of other conspirators who were not with them.

(Persaud Decl. ¶ 4.).

The Conspiracy Continued for at Least 949 Days:

This ATM skimming conspiracy appears to have resumed in 2018, after Gheorghe was released from prison.  Flight records show Gheorghe returned to Mexico in the Fall of 2018.  Gheorghe was observed there multiple times at the residence of Florian "The Shark" Tudor.  Tudor is a provider of ATM skimmers, and is currently

in custody in Mexico for attempted murder charges.  (PSR ¶ 12; Persaud Decl. ¶ 2.)

Gheorghe and Maria were stopped on February 7, 2019, at the airport in Cancun, Mexico where Gheorghe's wife Maria was found to have smuggled $80,000 in Barbados dollars on her person while returning from Panama. (PSR ¶ 54; Persaud Decl. ¶ 2.)  On March 21, 2019, Gheorghe's co-conspirator Alin Serdaru was recorded in an Indonesian jail complaining that Gheorghe (whom he referred to by his alias Romeo) was responsible for him being in jail on ATM skimming charges.  (Persaud Decl. ¶ 6; PSR ¶ 15.)

While the conspiracy almost certainly began in 2018, the government suggest being conservative and using as the starting date February 7, 2019, when Gheorghe and Maria were stopped with skimming proceeds.  There are 949 days between the conservative starting date of the conspiracy, February 7, 2019, and its ending date, September 13, 2021, when the defendants were arrested with counterfeited access devices.

The Minimum Actual Loss for the Conspiracy:

While the defendants were observed to use fraud cards at ATMs every day they were surveilled, the government suggests rounding day the minimum number of days in the conspiracy from 949 to 900 to be conservative.  Using the minimum loss figure per day of $5,000, discussed above, that works out to an estimated loss of $4.5 million.

**B.   A BETTER MEASURE OF LOSS: USING DOCUMENTED PROFITS**

When it is difficult to measure loss, the Guidelines permit the Court to use the conspirators' gain as an alternative:  "The court shall use the gain that resulted from the offense as an alternative

7

measure of loss only if there is a loss but it reasonably cannot be determined." USSG § 2B1.1, app. note 3(B). Here, there is a clearly defined minimum gain of over $2 million, albeit for only a small fraction of the duration of the conspiracy. While conducting an analysis of Gheorghe's cellular telephone, a conversation was identified with a contact saved as "TTBITCOIN" (later identified as Thuan Nham, a cyptocurrency money launderer). During this conversation, Gheorghe asked to transfer over $5 million dollars in cash to cryptocurrency between May 13, 2021, and September 9, 2021, or about four months. According to their conversation, approximately $2.06 million worth of these transactions actually took place. This is corroborated by an analysis of Gheorghe's cryptocurrency account at Binance, which showed over $2.04 million in deposits during the same timeframe. (The numbers are not identical because cryptocurrency prices fluctuate). Thus the conspiracy generated at least $2 million in profits in less than four months. This, of course, understates the cash the conspirators stole, as it pure profit converted into cryptocurrency by a single money launderer and deposited into a single account. It necessarily omits all the cash expenses incurred by the conspirators, such as their living expenses associated with maintaining a high-end criminal lifestyle over the course of 3 years, or the funds provided to criminal co-conspirators in the United States and Romania. For example, it excludes the over $108,000 Gheorghe Dumitru spent in cash on a Mercedes in May of 2021. (Persaud Decl. ¶ 5.)

Again to be conservative, if we round everything in the favor of the defense, there are 7.5 120-day periods in the truncated 900-

day duration of the conspiracy as 900 days, which generates estimated profits of $15 million for this conspiracy.

The $15 million profit estimate appears accurate.  While it is more than triple the $4.5 million estimate from observed losses, those losses were based on observations that were for only a few hours a day and did not cover all the conspirators, and so would be expected to be quite low.

Nevertheless, because the government believes that it is best when estimating losses to be conservative at every turn so that the Court is confident that the final loss figure is, it recommends using only the $4.5 million observed-loss estimate.  Doing so results in a guideline loss enhancement of +18, USSG § 2B1.1(b)(1)(H), just one loss category above that which would apply without any extrapolation at all based on the documented profits from the scheme during the last four months before they were arrested.  (USSG § 2B1.1(b)(1)(I), +16 for losses over $1.5 million based on the $2.04 million Gheorghe laundered through cryptocurrency.)

## II.   DEFENDANT LIED TO THE PROBATION OFFICER FOR THE PSR

According to defendant Gheorghe Dumitru, he normally works as a day laborer and panhandler.  (PSR ¶ 92).  If true, this would be mitigating; it would show that he generally does not support himself through crime.  But it is patently false.  Defendant wants the Court to believe that he travels internationally with his family just so that he can beg on the street and hustle day labor jobs abroad.  It would be difficult for defendant to earn enough money as a day laborer in Mexico, for example, to pay for international airline tickets, to say nothing of acquiring the equivalent of $40,000 USD

which the Mexican authorities found on defendant's wife and co-conspirator when they returned to that country from Panama in 2019. (PSR ¶ 54.)

Further, defendant claims that "he sold a house [in Romania] that he inherited and put that money towards bitcoin." (PSR ¶ 80). Presumably, defendant will argue that the roughly $600,000 in cryptocurrency seized by the government (PSR ¶¶ 20, 39, 47, and 98), and subject to a forfeiture allegation, represents not defendant's attempt to launder the cash proceeds of his ATM scam, but rather the proceeds of the claimed sale of his house in Romania. After the government requested documents supporting defendant's claim that the $600,000 in cryptocurrency was legitimate, defense counsel provided records that state:  (1) that Paula Velcu received about 150,000 Euros from the sale of a property in Romania; (2) that Paula Velcu says she gave that money to her son, defendant Gheorghe Dumitru, for "a family business"; and (3) a pawn receipt for 43,200 Lei, a little over $8,000, in the name of defendant's wife and co-defendant, Maria Dumitru, for over 220 grams of gold. (See, Exh. 1).

Defendant's claims regarding the source of the funds for the cryptocurrency he purchased are lies. According to the documents provided by defendant's family, his mother's sale of a house generated only 150,000 euros in bank deposits in Romania. But defendant purchased over $2 million of cryptocurrency for cash in the U.S. during just four months of his conspiracy here to steal cash from ATMs. Even if defendant's mother had really given defendant 150,000 euros, as she claims, it is absurd to think that somehow they would have converted her bank account containing euros

first into dollars, smuggled the cash into the U.S. where defendant's mere presence was a felony violation of 8 U.S.C. § 1326, and then had defendant convert the dollars into cryptocurrency. Defendant purchased over $2 million in cryptocurrency with U.S. dollars while he was in the U.S. because he needed some way to launder the proceeds of his ATM fraud and get those proceeds beyond the reach of U.S. authorities, which he did successfully for the majority of the $2 million, leaving only $600,000 in cryptocurrency to be seized.  (Indeed, defendant almost protected the $600,000, too, moving it from his own Binance account to that of his brother and co-conspirator SERDARU Alin days after defendant's arrest.) (Persaud Decl. ¶ 6.)

Where a defendant has "provid[ed] materially false information to a probation officer in respect to a presentence" report, the obstruction of justice enhancement applies.  USSG § 3C1.1, app. note 4(H).  C.f., United States v. Barnes, 125 F.3d 1287, 1292-93 (9th Cir.1997) (defendant subject to enhancement for failing to inform the probation officer about a fourth marriage in which he was subject to a temporary restraining order due to violent conduct to his former spouse because it had the potential to influence sentencing in his offense of fraudulently impersonating a doctor).

"Conduct resulting in an enhancement under § 3C1.1 (Obstruction . . . of Justice) ordinarily indicates that the defendant has not accepted responsibility. . . ."  USSG § 3E1.1, app. note 4.  It is the defendant's burden to establish that he has "clearly" accepted responsibility for his offense.  United States v. Alexander, 48 F.3d 1477, 1493 (9th Cir. 1995); USSG § 3E1.1(a).  A "defendant who

11

falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."  USSG 3E1.1, app. n. 1(A).

Here by falsely claiming to have legitimate income and legitimate sources for the cryptocurrency seized from his Binance account, defendant has failed to accept responsibility and instead has attempted to obstruct justice.

### A.   FINAL GUIDELINE RANGE

If the Court finds that defendant failed to accept responsibility (negating a -3 adjustment) and attempted to obstruct justice (adding a +2 adjustment), and used the +18 loss enhancement called for by the conservative extrapolation described above, then defendant's final offense level would be 39, resulting in a guideline range of 262-327 months in criminal history category II. As discussed below, however, defendant's criminal history category, while correctly calculated, greatly understates defendant's risk of recidivism.

### III. THE 3553(A) FACTORS

### A.   DEFENDANT HAS MOSTLY HIDDEN HIS ILLICIT PROCEEDS TO FUND A LAVISH POST-PRISON LIFESTYLE IN ROMANIA

Defendant clearly made a great deal of money in this case.  He supported his family of four with international travel, housing, and restaurant meals for years.  He purchased a Mercedes for over $108,000 in cash in May 2021.  And he purchased for cash over $2 million in cryptocurrency in just under four months, most of which has not been seized, to say nothing of what he stole during the other two plus years of this conspiracy.  This means that after the defendants serve their prison terms in this case, they will be able

to live lavishly in their home country.  Regrettably, many persons
would be willing to serve a modest prison sentence in exchange for
great wealth afterwards.  Indeed, defendant's earlier sentences of
up to seven years in prison clearly did not deter him from the fraud
he organized in this case.  It is imperative, therefore, that the
Court impose a prison sentence long enough so that others will not
wish to follow in defendant's footsteps.

   **B.   DEFENDANT'S CRIMINAL HISTORY CATEGORY IS UNDERSTATED**

       To be sure, the Probation Office correctly calculated
defendant's criminal history category, as the guidelines
specifically exclude convictions sustained outside the U.S.  But
criminal history category II wildly understates the risk of
recidivism presented by defendant.  Not only did he return to ATM
skimming after serving 12 months in federal prison for conspiracy to
commit bank fraud—the same charge to which he pled guilty in this
case (PSR ¶ 57)—but he has also sustained multiple violent felony
convictions abroad.  (PSR ¶ 60 "convicted for robbery with a firearm
in the United Kingdom"; ¶ 62 convicted of robbery in Romania; ¶ 63
of computer crimes in Germany).  Worse, sentences of over four years
in one case, and of seven years in another, were insufficiently long
to deter defendant from re-offending.  (PSR ¶¶ 62-63).  Just the
convictions identified by Probation, which very likely understate
defendant's true criminal record abroad, are more consistent with
someone in Criminal History Category V, than in Category II.  While
the Court is free to depart upwards in criminal history (cf.
4A1.2(h): "Sentences resulting from foreign convictions are not
counted, but may be considered under §4A1.3 (Departures Based on
Inadequacy of Criminal History Category . . . ")), the government

suggests that Court instead address this through the 3553(a) factors.

## CONCLUSION

The defendants illegally entered our country years ago for one purpose—to take advantage of the weaker ATM security here, which does not require cards containing computer chips.  They pursued fraud like a full-time job, netting millions of dollars in illicit proceeds, which have mostly not been recovered.  Defendant has no documented work history.  Instead, he has a criminal history that shows that when he is not in prison, he is either committing fraud or robbery.  Worse, defendant has used his energy and family connections to expand his criminality to include his relatives, causing his brother to get arrested in Indonesia (PSR ¶ 15) and using his own minor children to loot ATMs (PSR ¶¶ 14, 44).  Only a lengthy prison term could change the calculus for defendants and their co-conspirators, and persuade them that even the low risk of apprehension here outweighs the huge rewards they have already hidden away for themselves to spend when they are released from prison.  Mindful of the parsimony principle, the government recommends a sentence for defendant of 180 months in prison, which is below the guideline range the government believes applies.  While defendant has done little to warrant leniency beyond pleading guilty, that sentence coincides with defendant's appeal waiver. (Plea Agreement ¶ 20).  Such a sentence would be roughly twice as long as the longest sentence that defendant is known to have received so far (PSR ¶ 62), and so might provide the deterrent that defendant's previous encounters with the criminal justice system did not.  More likely, it would merely protect thousands of persons from

having their bank accounts looted—or their persons robbed (PSR ¶¶ 60, 62)—by defendant during the twelve or so years that defendant would actually be behind bars.[1]

Dated: November 21, 2022          Respectfully submitted,

                                  E. MARTIN ESTRADA
                                  United States Attorney

                                  SCOTT M. GARRINGER
                                  Assistant United States Attorney
                                  Chief, Criminal Division

                                  *Andrew Brown*

                                  _____
                                  ANDREW BROWN
                                  Assistant United States Attorney

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

---

[1] A nominal sentence of 180 months could be reduced by more than two years just for good-time credit.  Defendant appears to be angling also for the RDAP program based on his unsupported claims of drug and alcohol addiction (PSR ¶ 88), which could reduce his sentence by another year.

**Declaration of Rene Persaud**

I, RENE PERSAUD, do hereby declare and affirm:

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2018, and have served in law enforcement since 2011. I am assigned to investigate ATM skimming frauds, mostly conducted by organized crime groups, mostly from Romania. I have received specialized training in doing so.

**GHEORGHE DUMITRU RETURNED TO ATM SKIMMING IN 2018**

2. This ATM skimming conspiracy appears to have resumed in 2018, after Gheorghe Dumitru ("Gheorghe") was released from prison. Flight records show Gheorghe returned to Mexico in the Fall of 2018. Gheorghe was observed there multiple times at the residence of Florian "The Shark" Tudor. Tudor is a provider of ATM skimmers, and is currently in custody in Mexico for attempted murder charges. Gheorghe and Maria Dumitru ("Maria") were stopped on February 7, 2019, at the airport in Cancun, Mexico where Gheorghe's wife Maria was found to have smuggled $80,000 in Barbados dollars on her person while returning from Panama. On March 21, 2019, Gheorghe's co-conspirator Alin Serdaru was recorded in an Indonesian jail complaining that Gheorghe (whom he referred to by his alias Romeo) was responsible for him being in jail on ATM skimming charges. While the conspiracy almost certainly began in 2018, a very conservative starting date would be February 7, 2019, when Gheorghe and Maria were stopped with skimming proceeds. There are 949 days between the conservative starting date of the conspiracy, February 7, 2019, and its ending date, September 13, 2021, when the defendants were arrested with counterfeited access devices.

16

**The Minimum Intended Loss Per Card Is Over $1,200**

3.    Many of the access devices the defendants counterfeited got them nothing; the genuine holders of the cards extracted all the funds placed on those cards shortly after it was deposited onto them, leaving nothing for the defendants to later steal.  Needless to say, however, the defendants intended to take money from all the cards they went to the trouble of stealing, duplicating, and accessing.  A conservative intended loss figure for an individual access device is the average amount the defendants successfully stole from cards with non-zero balances.  The documented amount stolen from Bank of America divided by the number of cards used to obtain those funds is $1,214 ($207,750 divided by 171 cards).

**The Minimum Actual Cash Stolen Per Day Is Over $5,600**

4.    We have partial loss data for how much money this conspiracy generated per day from five days the San Diego PD surveilled Gheorghe and Maria, discussed below:

On August 10, 2021, they observed Gheorghe, Maria, and their juvenile daughter go to seven ATMs from 8:24am to 11:00am (i.e., 2.5 hours) and withdraw $15,560 in cash using 22 cards.

On August 11, 2021, they observed Gheorghe, Maria, and their juvenile daughter go to three ATMs from 5:49am to 7:57am (i.e., 2 hours) and withdraw $4,720 in cash using 7 cards.

On August 12, 2021, they observed just Gheorghe and Maria go to five ATMs from 9:22am to 1:02pm (i.e. less than 4 hours) and withdraw $900 using 1 card.

On August 18, 2021, they observed just Gheorghe and Maria go to six ATMs from 9:10am to 12:06pm (i.e. less than three hours) and withdraw $2,280 using 3 cards.  Bank of America linked these observed withdrawals to three more that were captured only on video surveillance around midnight from three more withdrawals, for a total minimum loss that day of $5,080 on 6 cards.

On August 23, 2021, they observed just Gheorghe and Maria go to two ATMs from 10:51am to 12:34pm (i.e. less than two hours) and make two withdrawals totaling $1,800 using 2 cards.

The total minimum actual withdrawals over the five days is $28,150, or $5,630 per day.  This necessarily understates the true loss, however, for the following reasons:

a.   Surveillance covered only a few hours of the day, and so missed conduct outside that window;

b.   The surveillance was directed only at Gheorghe and Maria, and so missed the conduct of other conspirators who were not with them; and

c.   The actual losses exclude intended losses, which would be much higher.

On nearly each day, the participants also conducted balance checks on over 150 cards, most of which had no funds to steal.

**$6 Million in Profits Per Year Based on Cryptocurrency Purchases**

5.   While conducting an analysis of Gheorghe's cellular telephone, a conversation was identified with a contact saved as "TTBITCOIN" (later identified as Thuan Nham, a cyptocurrency money launderer). During this conversation, Gheorghe asked to transfer over $5 million dollars in cash to cryptocurrency between May 13,

2021 and September 9, 2021, or about four months. According to their conversation, approximately $2.06 million worth of these transactions actually took place. Given the fluctuation of cryptocurrency between May 2021 and the time of Gheorghe's arrest, it is expected that the value of that $2.06 million worth of cryptocurrency to have increased or decreased in value. This is corroborated by an analysis of Gheorghe's cryptocurrency account at Binance, which showed over $2.04 million in deposits during the same timeframe. Thus it appears that the conspiracy generated over $2 million in profits in less than four months. This, of course, understates the cash the conspirators stole, as it pure profit converted into cryptocurrency by a single money launderer and deposited into a single account. It necessarily omits all the cash expenses incurred by the conspirators, such as their living expenses associated with maintaining a high-end criminal lifestyle, or the funds provided to criminal co-conspirators in the United States and Romania. By way of an example, according to business records, Gheorghe bought a Mercedes on May 25, 2021, for $108,783 cash using his alias "Ionut Romeo."

**GHEORGHE DUMITRU'S BROTHER COMPLAINED THAT HE WAS IN JAIL BECAUSE HE WORKED FOR GHEORGHE DUMITRU**

6.     I received from the Romanian authorities a recorded telephone call between VELCU Paula (defendant Gheorghe's mother, who submitted the affidavit about providing Gheorghe with funds from the sale of a house) and SERDARU Alin (defendant Gheorghe's brother who at the time was in a jail in Indonesia, and to whose Binance account Gheorghe's cryptocurrency was transferred just after his arrest). The time stamp is 03/21/2019 at 13:39:04. An FBI linguist

translated for me as indicated below.  In sum, SERDARU complains
that he has to sell his luxury car to pay for criminal defense
attorneys, and opines that defendant Gheorghe Dumitru should pay for
his attorneys because SERDARU was working for defendant Gheorghe
Dumitru:

SERDARU Alin – So, why do I have to sell my car, so that people
could take care of me, when ROMEO [Gheorghe Dumitru's alias] is the
one who sent me to the prison here? Shall I spend my own money? Do
you [plural] have a brain?

VELCU Paula – I just said that.

SERDARU Alin – For real now, do you want the car to be sold, so
that you could take care of me? Your son (DUMITRU Gheorghe, a.k.a.
"ROMEO") sent me. Is this how it should be?

VELCU Paula – It doesn't have to, dear. It's not okay.

SERDARU Alin – He took me from where I've made 11,000 in a
month and put me here. Now I have to sell my car (BMW 640D Xdrive)?
And I've also spent EUR 3,500 to get here. Come on, mother!

I declare under penalty of perjury that the foregoing is true
and correct to the best of my knowledge.

Dated: November 21, 2022

/s Rene Persaud

Special Agent Rene Persaud

*Translation from Romanian into English*

*CCBE - The Council of Bars and Law Societies of Europe*
*NATIONAL UNION OF BARS IN ROMANIA*
*DOLJ BAR – CRAIOVA*
*13 Constantin Brancusi street, Craiova*
*Phone: +4/0745518888*
*Phone / Fax: 0251/545212*
*e-mail: counsel_office.glavan@mail.ru*

## *AFFIDAVIT*

The undersigned Velcu Paula, domiciled in Craiova, ▮▮▮▮▮▮▮▮▮▮▮ holder of ID series ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ knowing the provisions of art. 326 of the Criminal Code on false statements, I declare on my own responsibility that I received from the said Nicola Stefan, ▮▮▮▮▮▮▮▮▮▮ the amount of EUR 150,000 (one hundred fifty thousand euros), representing part of the value of the building located in Craiova, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ according to the bilateral promise to sell no. 846/of 29.03.2019.

Also, I, the undersigned Velcu Paula, declare that the amount withdrawn from the bank account was EUR 147,000, out of the EUR 150,000, effectively transferred, as the bank fees were in the amount of EUR 3000.

I, the undersigned, Velcu Paula, hereby declare that the entire amount of EUR 147,000, I donated to Dumitru Gheorge, ▮▮▮▮▮▮▮▮▮▮▮ my son, in order to develop a family business.

This affidavit was made today, 09/25/2022, in 3 original copies, each party certifying that it is in possession of an original.

*VELCU PAULA*

*/illegible signature/*

Stamp: ALEXANDRU GLAVAN Law Office
4 Aleea Matei Basarab Street
Phone / Fax: 0351 444 459
In accordance with the provisions of art. */illegible/* para. (1) letter
c) of the Law no. 51/1995 hereby certify the date, the identity of
the parties and the content of this instrument.
No. 147 Date: 09/25/2022

Signature
*/illegible signature/*

*I, the undersigned, Saftescu Madalina Daniela, interpreter and translator, authorized for English and French, according to the authorization no. 37856 as of 06.10.2015 issued by the Ministry of Justice of Romania, certify the exactness of the translation made from Romanian into English, that the text that has been shown to me was completely translated, without omissions and that, through translation, the content and sense of the document have not been modified.*



Exhibit 1